1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7
8
9
10
11

| | |
|---|---|
| THE DISTANCE LEARNING COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>DERICK GENE MAYNARD, et al.,<br><br>Defendants. | Case No.  19-cv-03801-KAW<br><br>**ORDER GRANTING MOTION TO DISMISS**<br><br>Re: Dkt. No. 43 |

12

13        Plaintiff The Distance Learning Company filed this putative class action against

14   Defendants Bethany Susan Maynard and Derick Gene Maynard, asserting that Defendants are

15   seeking "to suppress competition and maintain control in the field of online traffic schools."  (First

16   Amended Compl. ("FAC") ¶ 2, Dkt. No. 39.)

17        Pending before the Court is Defendants' motion to dismiss.  (Defs.' Mot. to Dismiss, Dkt.

18   No. 43.)  Having considered the parties' filings and the relevant legal authority, the Court

19   GRANTS Defendants' motion.

20                                I.    BACKGROUND

21        Plaintiff and the putative class operate online driver's education and traffic schools in

22   California.  (FAC ¶ 9, 14.)  The California Department of Motor Vehicles ("DMV") permits any

23   company to set up a new traffic school by paying a $450 application fee if they have a course

24   curriculum, place of business, operator, and bond.  (FAC ¶ 32.)  California law requires that the

25   DMV maintain a list of driving schools, both on-line and in hard copy for distribution in traffic

26   courts.  (FAC ¶ 28.)  Plaintiff alleges that schools that appear on this list do not need to spend

27   money on advertising or marketing because they must be added to the list.  (FAC ¶ 29.)  The list is

28   not alphabetized, but auto-rotates every time a user accesses the DMV's website, displaying a

United States District Court
Northern District of California

United States District Court
Northern District of California

1  random list of several dozen traffic schools.  (FAC ¶¶ 47-48.)

2   Defendants are a husband and wife who also own and operate online traffic schools.  (FAC

3  ¶¶ 30, 40.)  Plaintiff asserts that Defendants have abused a "loophole" in the current DMV statute

4  and regulations.  (FAC ¶ 33.)  Specifically, Plaintiff alleges that Defendants have registered

5  hundreds of traffic schools that operate out of the same office space, with the intent of flooding the

6  DMV's list with numerous schools operated by the same owner and operator.  (FAC ¶ 35.)

7  "Defendants' schools, in many cases, have different names, but utilize the exact same website,

8  place of business, curriculum, and instructor."  (FAC ¶ 35.)  Defendants jointly and severally run

9  the traffic schools, which are located at the same physical access and "offer identical services for

10  identical prices."  (FAC ¶¶ 39, 41.)  Altogether, Plaintiff alleges that Defendants "jointly operate

11  1,500 of the 2,790 of the DMV's licensed traffic schools, or 53.8% of the licensed traffic schools,"

12  including setting up 501 schools on a single day in January 2019.  (FAC ¶¶ 37-38.)

13   Plaintiff alleges that Defendants have admitted in published news articles that the sole

14  purpose of opening so many traffic schools "was to flush out businesses who were charging lower

15  prices for the same services as Defendants."  (FAC ¶ 44.)  By creating so many traffic schools,

16  "Defendant[s] can attempt to monopolize the DMV's website, and to create high barriers to entry

17  for new traffic schools, in order to discourage competition."  (FAC ¶ 39.)  In short, by creating so

18  many "alter-ego proxy schools," Defendants can "increase their likelihood of appearing at or near

19  the top of the randomized list, thereby bettering their chance of being selected by a consumer, not

20  through any legitimate competitive advantage, but through sheer volume and luck of the

21  randomized draw."  (FAC ¶ 50.)  This is because consumers are unlikely "to scroll through and

22  research all 2,700 plus traffic schools to find a suitable and competitive option, especially given

23  the relatively low price point of these traffic school programs[.  Thus], schools listed at or near the

24  top of these randomized lists are the most likely to be selected by a consumer."  (FAC ¶ 49.)

25   Plaintiff further alleges that Defendants' actions encourage price collusion.  (FAC ¶ 72.)

26  Plaintiff asserts that the average price of an online traffic school is $17.00/person, but that

27  Defendants agreed to have their schools charge $7.00 higher than the industry average, an increase

28  of 41% from the industry average.  (FAC ¶¶ 70, 72.)  Plaintiff believes consumers are unlikely to

1    notice the change or care, permitting Defendants to "gouge consumers and prevent law-abiding

2    legitimate competitors, such as Plaintiff, from being exposed to consumers . . . ."  (FAC ¶ 76.)

3          On June 28, 2019, Plaintiff filed the instant case.  (Compl., Dkt. No. 1.)  On January 6,

4    2020, Plaintiff filed the operative complaint, alleging claims for: (1) violation of the Sherman Act

5    § 1 (unlawful collusion), (2) violation of the Sherman Act § 2 (unlawful monopolization), (3)

6    violation of the Sherman Act § 2 (attempted monopolization), (4) violation of the Unfair

7    Competition Law ("UCL"), and (5) violation of the Cartwright Act.  (FAC ¶¶ 81-136.)

8          On February 3, 2020, Defendants filed the instant motion to dismiss.  On March 4, 2020,

9    Plaintiff filed its opposition.  (Pl.'s Opp'n, Dkt. No. 48.)  On March 18, 2020, Defendants filed

10    their reply.  (Defs.' Reply, Dkt. No. 49.)

11          On May 5, 2020, the Court vacated the hearing, and requested supplemental briefing.

12    (Dkt. No. 54.)  On May 11, 2020, Plaintiff filed its supplemental brief.  (Pl.'s Supp. Br., Dkt. No.

13    55.)  On May 15, 2020, Defendants filed their supplemental brief.  (Defs.' Supp. Br., Dkt. No.

14    56.)[1]

15                       **II.    LEGAL STANDARD**

16          Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss based

17    on the failure to state a claim upon which relief may be granted.  A motion to dismiss under Rule

18    12(b)(6) tests the legal sufficiency of the claims asserted in the complaint.  *Navarro v. Block*, 250

19    F.3d 729, 732 (9th Cir. 2001).

20          In considering such a motion, a court must "accept as true all of the factual allegations

21    contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation

22    omitted), and may dismiss the case or a claim "only where there is no cognizable legal theory" or

23    there is an absence of "sufficient factual matter to state a facially plausible claim to relief."

24    *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010) (citing

25    *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009); *Navarro*, 250 F.3d at 732) (internal quotation

26

27    [1] On May 15, 2020, Plaintiff also filed a request for oral argument.  (Dkt. No. 57.)  Plaintiff did not explain why oral argument was needed.  Having reviewed Plaintiff's request, the parties'

28    filings, and the relevant legal authorities, the Court deems the matter suitable for disposition without a hearing pursuant to Civil Local Rule 7-1(b).

United States District Court
Northern District of California

1    marks omitted).

2          A claim is plausible on its face when a plaintiff "pleads factual content that allows the

3    court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

4    *Iqbal*, 556 U.S. at 678 (citation omitted).  In other words, the facts alleged must demonstrate

5    "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action

6    will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

7          "Threadbare recitals of the elements of a cause of action" and "conclusory statements" are

8    inadequate.  *Iqbal*, 556 U.S. at 678; *see also Epstein v. Wash. Energy Co*., 83 F.3d 1136, 1140 (9th

9    Cir. 1996) ("[C]onclusory allegations of law and unwarranted inferences are insufficient to defeat

10   a motion to dismiss for failure to state a claim.").  "The plausibility standard is not akin to a

11   probability requirement, but it asks for more than a sheer possibility that a defendant has acted

12   unlawfully . . . .  When a complaint pleads facts that are merely consistent with a defendant's

13   liability, it stops short of the line between possibility and plausibility of entitlement to relief."

14   *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (internal citations omitted).

15         If the court grants a motion to dismiss, it should grant leave to amend even if no request to

16   amend is made "unless it determines that the pleading could not possibly be cured by the

17   allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (citations omitted).

18                              **III.    DISCUSSION**

19        **A.    Sherman Act § 1 (Antitrust Conspiracy)**

20         "Section 1 of the Sherman Act prohibits '[e]very contract, combination in the form of trust

21   or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with

22   foreign nations.'"  *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1046 (9th Cir. 2008) (quoting 15

23   U.S.C. § 1).  Defendants contend this claim must be dismissed because: (1) Plaintiffs fail to allege

24   sufficient facts demonstrating an agreement or conspiracy between Defendants, and (2)

25   Defendants are legally incapable of conspiring amongst themselves because there is a unity of

26   interest.  (Defs.' Mot. to Dismiss at 7, 8.)

27               **i.    Sufficiency of the Pleading**

28         To plead a § 1 violation, a plaintiff must "plead not just ultimate facts (such as conspiracy),

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1    but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among

2    two or more persons or distinct business entities; (2) by which the persons or entities intended to

3    harm or restrain trade or commerce among the several States, or with foreign nations; (3) which

4    actually injures competition." *Kendall*, 518 F.3d at 1047.  Conclusory allegations that the

5    defendants entered into a contract, combination or conspiracy are insufficient; instead, a plaintiff

6    must plead "enough factual allegations to suggest an agreement was made." *Jones v. Micron*

7    *Tech., Inc.*, 400 F. Supp. 3d 897, 914-15 (N.D. Cal. 2019); *see also Kendall*, 518 F.3d at 1047.

8          "Factual allegations concerning an agreement to restrain trade can take two forms: direct or

9    circumstantial.  Direct evidence factual allegations are explicit and require no inferences to

10    establish the existence of a conspiracy." *Jones*, 400 F. Supp. 3d at 915 (internal quotation

11    omitted).  The Supreme Court has "suggested that to allege an agreement between antitrust co-

12    conspirators, the complaint must allege facts such as a 'specific time, place, or person involved in

13    the alleged conspiracies' . . . ." *Kendall*, 518 F.3d at 1047 (quoting *Twombly*, 550 U.S. at 565

14    n.10).  In contrast, a plaintiff relying on circumstantial evidence "must present allegations of

15    parallel conduct of the defendants as well as so-called 'plus factors.'  Parallel conduct occurs when

16    competitors act similarly or follow the same course of action . . . ." *Jones*, 400 F. Supp. 3d at 915

17    (citation omitted).  Plus factors are circumstances that "point[] toward a meeting of the minds of

18    the alleged conspirators," namely "economic actions and outcomes that are largely inconsistent

19    with unilateral, lawful conduct but largely consistent with explicitly coordinated action." *Id.*

20    (internal quotations omitted).

21          Here, Defendants argue that Plaintiff pleads inadequate facts of an agreement.  (Defs.'

22    Mot. to Dismiss at 7.)  The Court disagrees.  Plaintiff has alleged that Defendants entered into an

23    agreement to flood the marketplace with duplicate traffic schools at the same time, using the same

24    website, place of business, curriculum, and instructor.  (FAC ¶¶ 35, 41, 83.)  Such allegations go

25    beyond "bare, unsupported conclusions" of an agreement, as it specifically identifies who is

26    involved in the agreement, what was agreed to, how the agreement would be carried out, and the

27    intended effects of the agreement.

28          Additionally, even if such allegations were insufficient to directly demonstrate an

United States District Court
Northern District of California

1    agreement, Plaintiff has pled sufficient circumstantial evidence of an agreement.  Specifically,

2    Plaintiff has alleged parallel conduct, namely registering hundreds of traffic schools using the

3    same office space, website, curriculum, and instructor.  (FAC ¶ 35.)  Plaintiff has also alleged

4    circumstances that point to a meeting of the minds; in addition to using the same resources,

5    Defendants allegedly charged the same price and opened 500 traffic schools on the same day.

6    (FAC ¶¶ 35, 36, 72.)  It is difficult to imagine that such actions were coincidental, as Defendants

7    suggest.  (*See* Defs.' Mot. to Dismiss at 8.)

8           Accordingly, the Court finds Plaintiff has adequately pled an agreement between

9    Defendants.

10                  **ii.     Unity of Interest**

11          In the alternative, Defendants argue that the § 1 claim must be dismissed because "there is

12   a unity of interest among [Defendants] and the traffic schools they own," which makes Defendants

13   "legally incapable of conspiring among themselves."  (Defs.' Mot. to Dismiss at 8.)  The Court

14   agrees that as pled in the complaint, Defendants have a unity of interest.

15          "The distinction between unilateral and concerted conduct is necessary for a proper

16   understanding of the terms 'contract, combination . . . or conspiracy' in § 1."  *Copperweld Corp.*

17   *v. Indep. Tube Corp.*, 464 U.S. 752, 769 (1984).  Specifically, "[n]othing in the literal meaning of

18   those terms excludes coordinated conduct among officers or employees of the *same* company."

19   *Id.*  "The officers of a single firm are not separate economic actors pursuing separate economic

20   interests, so agreements among them do not suddenly bring together economic power that was

21   previously pursuing divergent goals."  *Id.*  Likewise, § 1 is not violated by coordination between a

22   corporation and one of its unincorporated divisions, or between a parent and its wholly owned

23   subsidiary.  *Id.* at 770, 772.  With respect to a parent and a subsidiary, this is because they "have a

24   complete unity of interest.  Their objectives are common, not disparate; their general corporate

25   actions are guided or determined not by two separate corporate consciousness, but one."  *Id.* at

26   771.

27          In determining whether entities are capable of conspiring, the key inquiry is whether the

28   alleged agreement or conspiracy "joins together separate decisionmakers."  *Am. Needle, Inc. v.*

1    *NFL*, 560 U.S. 183, 195 (2010).  The entities must be "separate economic actors pursuing separate

2    economic interests, such that the agreement deprives the marketplace of independent centers of

3    decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or

4    potential competition."  *Id.* at 195 (internal quotations omitted).  Thus, "it is not determinative that

5    two parties to an alleged § 1 violation are legally distinct entities."  *Id.* at 196.  Instead, "[t]he

6    question is whether the agreement joins together 'independent centers of decisionmaking.'  If it

7    does, the entities are capable of conspiring under § 1 . . . ."

8            Plaintiff argues that Defendants are comparable to the NFL teams in *American Needle, Inc.*

9    *v. National Football League*, which the Supreme Court found to be separate economic interests

10   capable of conspiring under § 1.[2]  (Pl.'s Opp'n at 23-24.)  There, the 32 NFL teams formed the

11   National Football League Properties ("NFLP") to develop, license, and market their intellectual

12   property, eventually granting exclusive licenses.  560 U.S. 183, 187 (2010).  The defendants

13   argued that the NFL, NFL teams, and NFLP were incapable of conspiring because they were a

14   single economic enterprise.  *Id.* at 188.  The Supreme Court rejected this argument, explaining that

15   "[t]he NFL teams do not possess either the unitary decisionmaking quality or the single

16   aggregation of economic power characteristic independent action."  *Id.* at 196.  Rather, each team

17   was "a substantial, independently owned, and independently managed business," with their

18   corporate actions "guided or determined by separate corporate consciousness, and their objectives

19   are not common."  *Id.* (internal quotations omitted).  Further, "[t]he teams compete with one

20   another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with

21   managerial and playing personnel."  *Id.* at 196-97.  Significantly, the NFL teams also "compete in

22   the market for intellectual property," as "[w]hen each NFL team licenses its intellectual property,

23   it is not pursuing the 'common interests of the whole' league but is instead pursuing interests of

24   each corporation itself."  *Id.* at 197.  Thus, each NFL team was a "separate, profit-maximining

25   entit[y], and their interests in licensing team trademarks are not necessarily aligned."  *Id.* at 198.

26

27   ────────────────

28   [2] Plaintiff also argues that a determination of whether there is a unity of interest is premature at the pleading stage.  (*See* Pl.'s Opp'n at 2 n.1.)  As discussed below, however, based on Plaintiff's own allegations, there appears to be a unity of interest.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1    *American Needle, Inc.* is readily distinguishable from the instant case.  There are no

2    allegations that Defendants are or were competitors; instead, they are alleged to be a *husband and*

3    *wife*, who would presumably have the same economic interest, especially given California's

4    community property laws.  (FAC ¶ 40; *see also* Cal. Fam. Code § 760 ("all property, real or

5    personal, wherever situated, acquired by a married person during the marriage while domiciled in

6    this state is community property").)  This fact cuts against a finding that Defendants would

7    ordinarily be competing against *each other* in the traffic school business absent the alleged

8    conspiracy.  Other allegations in the complaint further support a finding that Defendants have a

9    unity of interest, including that Defendants "jointly operate" the schools, which use the same

10   website, place of business, curriculum, and instructor.  (FAC ¶¶ 35, 37.)  In short, unlike the NFL

11   teams, there is nothing to suggest that Defendants interest were never aligned with respect to

12   owning and operating traffic schools, or that they are "independent centers of decisionmaking"

13   who, by working together, deprive the marketplace of actual or potential competition.

14       Instead, these facts are more akin to *Top Rank, Inc. v. Haymon*.  There, the plaintiff alleged

15   that the Haymon defendants (professional boxing management companies) and the Waddell

16   defendants (asset management and investment advisory firms) were conspiring together to

17   monopolize the boxing sport.  CV 15-4961-JFW (MRWx), 2015 U.S. Dist. LEXIS 164676, at *4-

18   5 (C.D. Cal. Oct. 16, 2015).  In dismissing the § 1 claim, the district court explained that the

19   defendants had "no alleged separate interest, at least as it relates to the relevant management and

20   promotion markets." *Id.* at *48.  Of particular significance, the district court explained that "the

21   Waddell Defendants, as asset management and investment advisory firms, are not actual or

22   potential competitors of the Haymon Defendants.  Accordingly, their alleged venture with the

23   Haymon Defendants does not deprive the marketplace of independent centers of decisionmaking,

24   or of a diversity of entrepreneurial interests, and thus of actual or potential competition." *Id.*

25   (internal quotation omitted).  Such is the case here, where Defendants are a husband and wife who

26   would not ordinarily be competing against each other in business.

27       In its supplemental brief, Plaintiff concedes that under the *American Needle* test, a husband

28   and wife would share a unity of interests.  (Pl.'s Supp. Br. at 1.)  Plaintiff, however, contends that

8

United States District Court
Northern District of California

1    this is not its allegation; rather, Plaintiff suggests that Defendants' 1,500 businesses are colluding

2    with one another.  (*Id.*)  Plaintiff's argument is contrary to the pleadings; for example, the

3    operative complaint alleges that "*Defendants* have together colluded to set up as many 'different'

4    schools as possible, in order to flood the DMV's list with many schools which are all operated by

5    the same owner/operator."  (FAC ¶ 35 (emphasis added); *see also* ¶¶ 50 ("Defendants' intention in

6    creating thousands of alter-ego proxy schools is to increase their likelihood of appearing at or near

7    the top of the randomized list."), 83 ("Defendants entered into an agreement to flood the

8    marketplace with fake/duplicate traffic schools at the same time").  These are actions that only

9    Defendants, not their schools, could have taken; the schools did not create themselves, nor did the

10   schools enter into an agreement to flood the market.  As alleged, the schools are the conduit

11   through which Defendants, the alleged conspirators, attempted to collude.

12          Further, even if Plaintiff had alleged the driving schools themselves were colluding, as

13   alleged, it appears unity of interest would still apply.  Here, the driving schools are jointly

14   operated by individuals who, as Plaintiff concedes, have a unity of interest.  Courts  have found

15   that no § 1 violation occurred when the "corporations were under common ownership and control .

16   . . ."  *Century Oil Tool, Inc. v. Prod. Specialties, Inc.*, 737 F.2d 1316, 1317 (5th Cir. 1984); *see*

17   *also Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819, 835

18   (M.D. La. 2002) ("Where two people together are controlling the affairs of separate corporations

19   those corporations cannot conspire under § 1 of the Sherman Act.")  Further, there are no

20   allegations that the driving schools would compete with each other; rather, they are all part of a

21   single operation to increase the market share for their common owner.

22          Absent allegations that would allow the Court to find that Defendants are competitors, the

23   Court finds that as pled, Defendants have a unity of interest and therefore are legally incapable of

24   conspiring under § 1.  Accordingly, the § 1 claim is dismissed without prejudice.  While it is

25   unclear the driving schools are capable of conspiring with each other, the Court will allow

26   amendment of this claim.

27          **B.    Sherman Act § 2 (Monopolization and Attempted Monopolization)**

28          Plaintiff alleges that Defendants have engaged in unlawful monopolization and attempted

monopolization, in violation of the Sherman Act § 2.  (FAC ¶¶ 94, 102.)  A monopoly claim has

two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful

acquisition or maintenance of that power as distinguished from growth or development as a

consequence of a superior product, business acumen, or historical accident."  *United States v.*

*Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).  Attempted monopoly has four elements: "(1)

specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct

directed at achieving that purpose; (3) a dangerous probability of achieving 'monopoly power';

and (4) causal antitrust injury."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1445 (9th Cir.

1995).

Here, Defendants effectively argue that Plaintiff's § 2 claims fail because Plaintiff has

failed to adequately allege market power.  In *Rebel Oil*, the Ninth Circuit explained that "reduction

of competition does not invoke the Sherman Act until it harms consumer welfare."  51 F.3d at

1433.  Thus, "an act is deemed *anticompetitive* under the Sherman Act only when it harms both

allocative efficiency *and* raises the prices of goods above competitive levels or diminishes their

quality."  *Id.*  In order to unilaterally "raise prices above competitive levels, the [defendant] must

obtain sufficient market power."  *Id.* at 1434.  A defendant "has sufficient market power when, by

restricting its own output, it can restrict marketwide output and, hence, increase marketwise

prices."  *Id.*  To establish market power, "[t]he most common type of proof is circumstantial

evidence pertaining to the structure of the market."  *Rebel Oil*, 51 F.3d at 1434.  Thus, "a plaintiff

must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that

market, and (3) show that there are significant barriers to entry and show that existing competitors

lack the capacity to increase their output in the short run."  *Id.*  The Ninth Circuit has applied these

same factors in both monopolization and attempted monopolization cases, although a lesser

market share suffices for attempted monopolization.  *See Rebel Oil*, 51 F.3d at 1432-34 (applying

market power factors in an attempted monopolization case); *W. Parcel Express v. UPS of Am.*, 190

F.3d 974, 975 (9th Cir. 1999) (applying market power factors in a monopolization case).

### i.   Relevant Market

First, Defendant argues that Plaintiff improperly limited the relevant market to online

10

1   traffic schools because Plaintiff should have also included brick and mortar traffic schools.

2   (Defs.' Mot. to Dismiss at 10.)  The relevant market is "the pool of goods of services that enjoy

3   reasonable interchangeability of use and cross-elasticity of demand."  *Tanaka v. Univ. of S. Cal.*,

4   252 F.3d 1059, 1063 (9th Cir. 2001) (internal quotation omitted).  Thus, "defining the product

5   market involves identification of the field of competition: the group or groups of sellers or

6   producers who have actual or potential ability to deprive each other of significant levels of

7   business."  *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1374 (9th Cir. 1989).

8           A court may dismiss a monopolization claim if the plaintiff "alleges a proposed relevant

9   market that clearly does not encompass all interchangeable substitute products."  *ChriMar Sys. v.*

10  *Cisco Sys.*, 72 F. Supp. 3d 1012, 1017 (N.D. Cal. 2014) (internal quotation omitted).  Dismissal

11  under Rule 12(b)(6), however, is only appropriate "if the complaint's 'relevant market' definition

12  is facially unsustainable" because "the validity of the 'relevant market' is typically a factual

13  element rather than legal element . . . ."  *Newcal Indus. v. Ikon Office Solutions, Inc.*, 513 F.3d

14  1038, 1045 (9th Cir. 2008).

15          Here, Plaintiff's limitation of the relevant market to online traffic schools is not "facially

16  unsustainable."  While Defendants point to Plaintiff's allegation that both online and brick and

17  mortar schools appear on the DMV's list, this does not necessarily mean the services provided are

18  interchangeable.  (*See* Defs.' Mot. to Dismiss at 10; FAC ¶ 28.)  As Plaintiff points out, online

19  traffic schools may be "more convenient, less time consuming, and cheaper" than brick and mortar

20  schools.  (*See* Pl.'s Opp'n at 23.)  Indeed, an individual may be able to use an on-line traffic

21  school located anywhere in California, but would be limited to specific brick and mortar schools

22  in their surrounding area.  Thus, not all brick and mortar schools would have "actual or potential

23  ability to deprive" the internet traffic schools "of significant levels of business."  *Thurman Indus.,*

24  *Inc.*, 875 F.2d at 1374.  Whether Plaintiff's defined market is too narrow is a determination

25  appropriately left for summary judgment or trial.

26          **ii.    Market Share**

27          Second, Defendants argue that even if the relevant market is limited to only online traffic

28  schools, Plaintiff has not alleged adequate market share.  (Defs.' Mot. to Dismiss at 11.)

United States District Court
Northern District of California

11

United States District Court
Northern District of California

1   "Calculation of the market share allows for a proper understanding of the defendant's influence

2   and relative power in the relevant market.  A dominant share of the market often carries with it the

3   power to control output across the market, and thereby control prices." *Image Tech. Servs. v.*

4   *Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997).  For a monopolization claim, "[c]ourts

5   generally require a 65% market share to establish a prima facie case of market power." *Id.*  For an

6   attempted monopolization claim, "a lower quantum than the minimum showing required in an

7   actual monopolization case." *Rebel Oil*, 51 F.3d at 1438.  Most attempted monopolization "cases

8   hold that a market share of 30 percent is presumptively insufficient to establish the power to

9   control price," although the Ninth Circuit has found that a market share of 44% was sufficient

10  where "entry barriers are high and competitors are unable to expand their output in response to

11  supracompetitive pricing." *Id.*

12      Here, Plaintiff alleges that Defendants have a 53.8% market share because Defendants own

13  and operate approximately 53.8% of the DMV's licensed traffic schools.  (FAC ¶¶ 37, 62, 73.)

14  Thus, Plaintiff argues that this 54% market share is sufficient to survive a motion to dismiss

15  because it lies in the "gray area of the law" between the 30% and 65% thresholds identified by the

16  Ninth Circuit.  (Pl.'s Opp'n at 19.)  Operating 53.8% of online traffic schools, however, does not

17  automatically mean Defendants conduct 53.8% of all online traffic school *business*; Defendants

18  correctly argue Plaintiff has offered "no basis . . . for the implausible underlying assumption that

19  market share in a given market is distributed evenly to all business in that market."  (Defs.' Mot.

20  to Dismiss at 11.)  At best, Plaintiff can demonstrate that Defendants occupy 53.8% of the DMV's

21  list, but even taking as true the allegation that consumers are likely to select the schools listed at

22  the top of the list, this does not translate to market share.  There is no allegation, for example, that

23  most or even a meaningful number of consumers use the DMV's list to begin with, as opposed to

24  an internet search.  (*See* Defs.' Reply at 10.)

25      In its supplemental briefing, Plaintiff argues that the vast majority of business for online

26  schools (80%) does come from the DMV list.  (Pl.'s Supp. Br. at 1.)  Plaintiff also cites to the drop

27  in its business and that of other online traffic schools since Defendants' alleged opening of

28  thousands of online schools.  (*Id.* at 1-2.)  Such facts, however, were not in the operative

1    complaint. It is also not clear that even assuming Defendants now have 53.8% of the 80% of

2    business that goes through the DMV list (*i.e.*, 43.04% of all business), this would be sufficient for

3    a monopolization claim, which generally requires a 65% market share.  *See Image Tech. Servs.*,

4    125 F.3d at 1206.  Even for an attempted monopolization claim, this 43.04% share is less than the

5    44% share in *Rebel Oil*, which the Ninth Circuit found sufficient because there were high barriers

6    of entry.  51 F.3d at 1438.

7          Because Plaintiff has not alleged facts demonstrating adequate market share, Plaintiff's § 2

8    claims must be dismissed.

9             **iii.    Barriers to Entry**

10         Finally, Defendants argue that Plaintiff has not alleged any significant barriers to market

11   entry.  (Defs.' Mot. to Dismiss at 12.)  "A § 2 plaintiff must show that new competitors face high

12   market barriers to entry and that current competitors lack the ability to expand their output to

13   challenge a monopolist's high prices."  *Image Tech. Servs.*, 125 F.3d at 1208.  "Entry barriers are

14   additional long-run costs that were not incurred by incumbent firms but must be incurred by new

15   entrants, or factors in the market that deter entry while permitting incumbent firms to earn

16   monopoly returns.  *Rebel Oil Co.*, 51 F.3d at 1439.  Typical entry barriers include: "(1) legal

17   license requirements; (2) control of an essential or superior resource; (3) entrenched buyer

18   preferences for established brands; (4) capital market evaluations imposing higher capital costs on

19   new entrants; and, in some situations, (5) economies of scale."  *Id.*

20         The Court finds that Plaintiff has not alleged significant barriers to entry.  As Plaintiff

21   itself alleges, "the DMV allows any company to pay the $450 application fee, and set up a new

22   traffic school[]," in addition to having a course curriculum, place of business, operator, instructor,

23   and a bond.  (FAC ¶ 32.)  These are not significant barriers that prevent new competitors from

24   entering the market.

25         Instead, Plaintiff essentially argue that in order to *compete* with Defendants, new entrants

26   must pay $675,000 in DMV application fees in order to set up 1,500 traffic schools of their own.

27   (Pl.'s Opp'n at 7, 21; FAC ¶ 59.)  In *United States v. Syufy Enterprises*, however, the Ninth Circuit

28   rejected the argument that "competition is itself a structural barrier to entry."  903 F.2d 659, 667

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1    (9th Cir. 1990).  There, Syufy operated a movie theater, eventually buying out most of his

2    competitors.  *Id.* at 662.  The Ninth Circuit found that Syufy did not have the power to exclude

3    competition, as there were "no structural barriers to entry into the market . . . . To the contrary, the

4    record discloses a rough-and-tumble industry, marked by easy market access, fluid relationships

5    with distributors, an ample and continuous supply of product, and a healthy and growing demand."

6    *Id.* at 667.  As to the government's argument that "competitors w[ould] be deterred from entering

7    the market because they could not hope to turn a profit competing against Syufy," the Ninth

8    Circuit "ma[de] clear . . . that an efficient, vigorous, aggressive competitor is not the villain

9    antitrust laws are aimed at eliminating."  *Id.* at 667-68.

10        Alternatively, Plaintiff argues that Defendants have been able to charge rates 40% greater

11    than the industry average by overwhelming the DMV list, thus demonstrating an ability to control

12    prices.  (Pl.'s Opp'n at 19.)  It is not clear how this is relevant to barriers to entry or barriers to

13    expansion; the fact that Defendants charge a higher rate than the industry average does not

14    necessarily mean Defendants are preventing new entrants to the market or that current competitors

15    cannot expand their output to challenge Defendants' higher prices.  *See Image Tech. Servs.*, 125

16    F.3d at 1208.

17        Accordingly, the Court finds that Plaintiff has failed to allege the second and third market

18    power factors.  As amendment is not futile, Plaintiff's § 2 claims are DISMISSED without

19    prejudice.

20        **C.    Cartwright Act**

21        "The analysis under California's antitrust law mirrors the analysis under federal law

22    because the Cartwright Act, Cal. Bus. & Professions Code § 16700 et seq., was modeled after the

23    Sherman Act."  *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2011).

24    Thus, where the plaintiff's "claim under the Cartwright Act is predicated on the same conduct

25    underlying the Sherman Act claims[,] the legal analysis of [the] Cartwright Act claim . . . should

26    mirror the analysis under the Sherman Act claims."  *Stewart v. Gogo, Inc.*, Case No. 12-cv-5164-

27    EMC, 2013 U.S. Dist. LEXIS 51895, at *15 (N.D. Cal. Apr. 10, 2013).  Here, Plaintiff's

28    Cartwright Act complains of the same actions as the Sherman Act claims, namely Defendants'

14

1    alleged agreement to create duplicate traffic schools, using the same websites, business addresses,

2    owners, and operators, in order to flood the marketplace.  (*See* FAC ¶ 133.)  Thus, Plaintiff's

3    Cartwright Act claim is DISMISSED without prejudice.

4          **D.    Unfair Competition Law ("UCL")**

5          "The UCL is a broad remedial statute that permits an individual to challenge wrongful

6    business conduct 'in whatever context such activity might occur.'"  *Lozano v. AT&T Wireless*

7    *Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007) (quoting *Cel-Tech Commc'ns, Inc. v. L.A. Cellular*

8    *Tel. Co.*, 20 Cal. 4th 163, 181 (1999)).  The UCL prohibits "unlawful competition," defined as

9    "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

10   misleading advertising . . . ."  Cal. Bus. & Prof. Code § 17200.  "Because the statute is written in

11   the disjunctive, it is violated where a defendant's act or practice is (1) unlawful, (2) unfair, (3)

12   fraudulent, or (4) in violation of section 17500 (false or misleading advertisements)."  *Lozano*, 504

13   F.3d at 731 (internal citation omitted).

14          Here, Plaintiff brings UCL claims under the unlawful and unfair prongs.  (*See* FAC ¶ 110-

15   112.)  As discussed above, Plaintiff has failed to allege violations of the Sherman Act or

16   Cartwright Act, and therefore the UCL claim based on the unlawful prong fails.

17          The parties dispute, however, whether the UCL claim based on the unfair prong may

18   survive independent of the Sherman Act or Cartwright Act claims.  In general, "[e]ach prong of

19   the UCL is a separate and distinct theory of liability; thus, the 'unfair' practices prong offers an

20   independent basis for relief."  *Lozano*, 504 F.3d at 731. Plaintiff argues that to determine whether

21   the "unfair" UCL claim can survive, the Court should apply: "(1) the traditional balancing test; (2)

22   the FTC Act section 5 test; or (3) the *Cel-Tech* tethering test."  (Pl.'s Opp'n at 9.)  The Court finds

23   that the traditional balancing test and FTC Act section 5 test do not apply, and Plaintiff does not

24   satisfy the *Cel-Tech* tethering test.

25          First, with respect to the Section 5 test, Plaintiff itself acknowledges that "it is not the

26   appropriate standard in this case for the UCL claims."  (Pl.'s Opp'n at 10.)  It is therefore unclear

27   how the Section 5 test is relevant to the instant case.

28          Second, with respect to the traditional balancing test, "the California Supreme Court

United States District Court
Northern District of California

United States District Court
Northern District of California

1    rejected the balancing test . . . in suits involving unfairness to the defendant's competitors."

2    *Lozano*, 504 F.3d at 735; *see also Morris v. BMW of N. Am., LLC*, Case No. 07-2827-WHA, 2007

3    U.S. Dist. LEXIS 85513, at *19 (N.D. Cal. Nov. 7, 2007) (same); *Hadley v. Kellogg Sales Co.*,

4    243 F. Supp. 3d 1074, 1104 (N.D. Cal. 2017) ("[t]he California Supreme Court has rejected the

5    traditional balancing test for UCL claims between business competitors and instead requires that

6    claims under the unfair prong be 'tethered to some legislatively declared policy.'") (quoting *Cel-

7    Tech*, 20 Cal. 4th at 186).  While Plaintiff alleges damage to consumers because Defendants

8    charge higher prices, Plaintiff cites no authority that the balancing test applies when the case is

9    brought by a *competitor*, as is the case here.  *See Almasi v. Equilion Enters., LLC*, Case No. 10-cv-

10   3458-EJD, 2012 U.S. Dist. LEXIS 128623, at *26 (N.D. Cal. Sept. 10, 2012) ("Plaintiffs do not

11   cite any authority indicating that the balancing test applies in cases where a plaintiff is not a

12   consumer.").  Ultimately, Plaintiff brings this case not on behalf of consumers, but on behalf of

13   competitors such as itself.  Accordingly, the traditional balancing test does not apply in this case.

14       Finally, the Court finds that Plaintiff does not satisfy the *Cel-Tech* tethering test.  In *Cel-*

15   *Tech*, the California Supreme Court explained that "a practice may be deemed unfair even if it is

16   not specifically proscribed by some other law." 20 Cal. 4th at 180.  The California Supreme Court

17   acknowledged, however, that in "determin[ing] whether the challenged conduct is unfair within

18   the meaning of the unfair competition law[,] courts may not apply purely subjective notions of

19   fairness." *Id.* at 184.  Thus, "[w]hen a plaintiff who claims to have suffered injury from a direct

20   competitor's 'unfair' act or practice invokes section 17200, the word 'unfair' in that section means

21   conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of

22   one of those laws because its effects are comparable to or the same as a violation of the law, or

23   otherwise significantly threatens or harms competition." *Id.* at 187.

24       Following *Cel-Tech*, courts have found that a UCL claim based on the "unfair" prong

25   cannot survive when it is premised on the same actions as an alleged statutory antitrust claim.  In

26   *Chavez v. Whirlpool Corp.*, the California Court of Appeal found:

27       If the same conduct is alleged to be both an antitrust violation and an
         'unfair' business act or practice for the same reason -- because it
28       unreasonably restrains competition and harms consumers -- the

16

United States District Court
Northern District of California

1

2

3

> determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not 'unfair' toward consumers. To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct.

4   93 Cal. App. 4th 363, 375 (2001). Applying *Chavez*, the Ninth Circuit in an unpublished decision

5   upheld the dismissal of a UCL claim based on the "unfair" prong, finding that "[w]here . . . the

6   same conduct is alleged to support both a plaintiff's federal antitrust claims and state-law unfair

7   competition claim, a finding that the conduct is not an antitrust violation precludes a finding of

8   unfair competition." *LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed. Appx. 554, 558 (9th Cir.

9   2008); *see also GreenCycle Paint, Inc. v. PaintCare, Inc.*, Case No. 15-cv-4059-MEJ, 2016 U.S.

10  Dist. LEXIS 47960, at *31 (N.D. Cal. Apr. 8, 2016) ("where the same conduct alleged to be unfair

11  under the UCL is also alleged to be a violation of another law, the UCL claim rises or falls with

12  the other claims") (internal quotation omitted); *DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d

13  1119, 1147 (N.D. Cal. 2010) ("DocMagic has not alleged facts showing that Ellie Mae's conduct

14  violated the Sherman Act by posing a dangerous threat of monopoly in the DPS market. As a

15  result, any claims DocMagic might be asserting under the UCL's unfair prong necessarily fail as

16  well."); *ChriMar Sys.*, 72 F. Supp. 3d at 1020 ("Courts have held that where the alleged conduct

17  does not violate the antitrust laws, a claim based on unfair conduct under the UCL cannot

18  survive."); *Los Gatos Mercantile, Inc. v. E.I. Dupont de Nemours & Co.*, Case No. 13-cv-1180-

19  BLF, 2014 U.S. Dist. LEXIS 133540, at *32 (N.D. Cal. Sept. 22, 2014) ("Because Plaintiffs have

20  failed to state a claim for an antitrust violation, they have failed to state a claim under the UCL

21  based upon the alleged anticompetitive conduct.").[3]

22         Such is the case here, where Plaintiff's claims are based on the same actions that underlie

23  the statutory violations, namely the creation of duplicate traffic schools in order to flood the

24  marketplace. (FAC ¶ 112.) Because Plaintiff's factual allegations do not rise to a violation of the

25  _____

26  [3] In its supplemental brief, Plaintiff argues that *Chavez* was limited to cases involving safe harbors. (Pl.'s Supp. Br. at 3.) As discussed above, however, numerous courts have applied

27  *Chavez*, focusing on whether the plaintiff is relying on the same factual allegations for both the statutory violation and a UCL claim based on the "unfair" prong. The above cases did not involve

28  conduct which was condoned under antitrust laws.

17

United States District Court
Northern District of California

1   Sherman Act or the Cartwright Act, those same factual allegations cannot give rise to a UCL claim

2   based on the "unfair" prong. Accordingly, Plaintiff's UCL claim is DISMISSED without

3   prejudice.[4]

4       **E.    Remedies**

5       Defendants also challenge the remedies sought by Plaintiff, namely restitution under the

6   UCL, injunctive relief, and punitive damages.  (Defs.' Mot. to Dismiss at 18-20.)  As the Court

7   finds that the complaint must be dismissed for failure to state a claim, the Court need not address

8   these arguments.  The Court notes, however, that Plaintiff generally did not address the arguments

9   made and legal authority cited by Defendants, particularly with respect to whether restitution is

10  available for lost profits or if punitive damages are cognizable under any of Plaintiff's claims.  In

11  the future, Plaintiff must address the arguments made or the Court will presume that Plaintiff

12  agrees with Defendants' position.

## IV.    CONCLUSION

13

14      For the reasons stated above, the Court GRANTS Defendants' motion to dismiss.  Plaintiff

15  may file an amended complaint within **thirty days** of the date of this complaint.

16      IT IS SO ORDERED.

17  Dated: June 4, 2020

18                                                  KANDIS A. WESTMORE
                                                    United States Magistrate Judge
19

20

21

22

23

---

24  [4] In the alternative, Defendants argue that Plaintiff's UCL claim must be dismissed because it falls
    within the safe harbor of the DMV traffic school statutes, namely California Vehicle Code §
25  11200 *et seq.*  Section 11202(7)(B) provides: "A person may be an operator for more than one
    traffic school if (i) the schools have a common owner or owners and (ii) the schools share a single
26  established business address."  Defendants thus contend that its ownership of multiple traffic
    schools is expressly permitted by statute, and cannot support a UCL claim.  (Defs.' Mot. to
27  Dismiss at 15.)  The Court need not reach this issue because the Court finds that the UCL claim
    fails for separate reasons.  The Court observes, however, that the Supreme Court in *Cel-Tech*
28  found that "[i]f the Legislature has permitted certain conduct or considered a situation and
    concluded no action should lie, courts may not override that determination."  20 Cal. 4th at 182.